**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 07-526 T
(Judge Nancy B. Firestone)

---

ALBERT BOVA and DAVID TONER, CO-EXECUTORS OF
THE ESTATE OF MARGARET WALSONAVICH

Plaintiffs,

v.

THE UNITED STATES

Defendant.

---

**REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

---

Defendant, the United States, hereby replies to plaintiffs' response to defendant's motion to dismiss the complaint under RCFC 12(b)(6), for failure to state a claim upon which relief can be granted. As defendant demonstrated in its motion, plaintiffs have failed to qualify for relief, under § 6511(h) and Rev. Proc. 99-21, from the three-year statute of limitations imposed by § 6511(d)(2).[1] Therefore, plaintiffs' claim is barred by statute and no relief can be granted. Plaintiffs' attempt to suspend the statute of limitations fails, because plaintiffs' facts preclude them from being able to provide the personal statement required by § 6511(h) and Rev. Proc. 99-21. Accordingly, plaintiffs' Complaint must be dismissed.

---

[1] Unless otherwise indicated, all references to "§" and "section" are to the Internal Revenue Code of 1986 (26 U.S.C.).

**THE STATUTE OF LIMITATIONS IN § 6511(d)(2) BARS PLAINTIFFS' REFUND CLAIM BECAUSE PLAINTIFFS DO NOT QUALIFY FOR A SUSPENSION OF THE STATUTE OF LIMITATIONS**

Plaintiffs, Albert Bova and David Toner, ("Mr. Bova" and "Mr. Toner"), hope to preserve their action by suggesting that there is at least some doubt regarding the conclusion mandated by the applicable statute of limitations, which precludes plaintiffs' recovery in the instant action. (Pl. Resp. at 7). Decedent ("Ms. Walsonavich"), whose interests plaintiffs now represent, executed a general power of attorney under Pennsylvania law on February 3, 1998, authorizing Mr. Bova to manage her financial affairs, including "all matters pertaining to federal, state or local taxes". (Compl. ¶ 7; Compl. Exhibit A, pages 1, 3). In 2001, Ms. Walsonavich reported a net operating loss which allegedly established a carryback that entitled her to a refund for her 1996 tax year. Under § 6511(d)(2), Ms. Walsonavich was allowed to file a claim for the 1996 refund within three years from the date on which her 2001 tax return was due. Ms. Walsonavich's 2001 tax return was due on April 15, 2002, meaning that her right to file a claim for any 1996 refund expired on April 15, 2005. Plaintiffs filed Ms. Walsonavich's claim on May 25, 2005 – 40 days after her right to claim a refund for the 1996 tax year expired.

Plaintiffs concede that § 6511(d)(2) established a deadline for filing Ms. Walsonavich's 1996 refund claim by April 15, 2005. (Compl. ¶ 14). Nonetheless, they argue that defendant's motion to dismiss should not be granted because they allege that Ms. Walsonavich was "financially disabled" under § 6511(h), and that the statute of limitations was suspended during her disability. However, on the face of plaintiffs' pleadings, Ms. Walsonavich did not qualify for a suspension of the statute of limitations

under § 6511(h). Thus, she was subject to the statute of limitations in § 6511(d)(2) and plaintiffs are barred from recovering the alleged overpayment.

I. Decedent did not qualify for a suspension of the § 6511(d)(2) statute of limitations because she was not "financial disabled" as defined in § 6511(h) and Rev. Proc. 99-21.

Despite plaintiffs' efforts to cast doubt on the certainty of the statutory bar to their action, plaintiffs' own allegations force the conclusion that their recovery is barred and the Complaint must be dismissed. A claim of financial disability must be proved by the taxpayer in the "form and manner" required by the Secretary. § 6511(h)(2)(A). The Secretary established the form and manner of proving such a claim in Rev. Proc. 99-21. The revenue procedure describes two documents needed to prove a claim of financial disability. The first document is a certified physician's statement, the substance of which plaintiffs completed with their most recent filing.[2] The second document is a personal statement, in which the taxpayer attests to the fact that no other person was authorized to manage his or her financial affairs during the period in which the taxpayer was disabled. Plaintiffs are prevented from making this representation on behalf of Ms. Walsonavich, because at all times during which it is alleged that she suffered from a disability, Mr. Bova was in fact authorized to manage her financial affairs.

Plaintiffs' concede that this personal statement is required by Rev. Proc. 99-21. (Pl. Resp. at 6). Plaintiff's also admit that the power of attorney Ms. Walsonavich executed on behalf of Mr. Bova did not contain a *written* contingency which would have

[2] Rev. Proc. 99-21 § 4 requires that a certified physician's statement be attached to a taxpayer's claim for refund where the taxpayer is seeking § 6511(h) relief from the statute of limitations. Plaintiffs' earlier filings contained most of the requirements listed in Rev. Proc. 99-21, but did not include the physician's certification. Plaintiffs included a certification with their most recent filing. Plaintiffs have technically fallen short of the requirement that the certified physician's statement be filed with the claim for refund, but it is the more substantial issue of the plaintiffs' inability to produce the personal statement required by Rev. Proc. 99-21 that motivates defendant's motion to dismiss the Complaint.

barred Mr. Bova from being authorized to manage Ms. Walsonavich's finances as of February 3, 1998, the date on which the power of attorney was executed. (Pl. Resp. at 8). Instead, plaintiffs allege that Ms. Walsonavich and Mr. Bova had an "oral agreement" that the power of attorney would activate only if "decedent could not handle her affairs due to some disability." (Compl. ¶ 8; Pl. Resp. at 4). This single self-serving allegation forms the basis upon which plaintiffs contend that defendant's motion to dismiss should be denied. Plaintiffs' argument fails for two reasons. First, it is not supported by Pennsylvania law and the relevant documents. Second, plaintiff's own allegations require the conclusion that Mr. Bova was authorized to manage Ms. Walsonavich's finances when his power of attorney was executed, or at the latest, at the first instant that she became disabled.

A. Pennsylvania law does not support plaintiff's contention that Mr. Bova's power of attorney over Ms. Walsonavich's finances was limited by an "oral agreement" contingency.

Pennsylvania adopted a variation of the *Uniform Durable Power of Attorney Act of 1979*, drafted by the National Conference of Commissioners on Uniform State Laws.[3] Pennsylvania law recognizes at least two forms of powers of attorney: a "durable power" and a "springing power". The statute that authorizes durable powers provides that "[t]he power conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity." 20 Pa.C.S.A. § 5604(a) (*i.e.*, the power is exercisable prior to the principal's disability or incapacity). The statute also provides that, "[u]nless the

[3] In the section entitled "Action by Adopting Jurisdictions" of the commentary to the Uniform Durable Power of Attorney Act of 1979, the Commissioners note that, "the substance of sections, 1, 2, and 3 of the Uniform Act is combined in one section of the Pennsylvania act. . ." Unif. Durable Power of Attorney Act § 1 (1979). Although the Pennsylvania statute does not track the exact language of the uniform act, it is substantively the same in all respects. See Appendix 1 for a comparison of the language in the uniform act and the Pennsylvania statute.

power of attorney states a time of termination, it is valid notwithstanding the lapse of time *since its execution*." 20 Pa.C.S.A. § 5604(b) (emphasis added) (*i.e.*, an unqualified power is effective or "activated" on the date it is executed).

A durable power can be converted to a springing power by specifying a contingency that will trigger the holder's authority to act on behalf of the principal. The Pennsylvania statute provides, "A principal may provide *in the power of attorney* that the power shall become effective at a specified future time, or upon the occurrence of a specified contingency." 20 Pa.C.S.A. § 5604(a) (emphasis added). Plaintiffs misconstrue the meaning of this sentence, suggesting that the word *may* indicates that written contingencies represent one of several ways in which a durable power of attorney can be made contingent upon some triggering event. Specifically, plaintiffs suggest that an "oral agreement" is an alternate means of establishing a contingency that limits an otherwise "activated" durable power of attorney. (Pl. Resp. at 5).

Contrary to plaintiffs' interpretation, the Pennsylvania statute means that unqualified powers of attorney are, by default, durable powers that are "activated" when executed, *unless* limited by some specified contingency that is identified in the document. This interpretation is supported by the comments from the Commissioners of the National Conference on Uniform States Laws, which drafted the model act upon which the Pennsylvania statute is based. In addressing questions about the immediacy of the powers conferred by the execution of a durable power, the Commissioners first noted that "a durable power with postponed effectiveness is permitted. " Unif. Durable Power of Attorney Act § 1 (1979) (Comment). They then suggested that the way to postpone "activation" of the power is through a written contingency in the instrument. *Id*.

"[D]raftsmen of durable powers are not limited in their choice of words to describe the later time when the principal wishes the authority of the agent in fact to become operative." *Id*. Although Pennsylvania has altered the language of the uniform statute, the substance of the Commonwealth's law remains the same: powers of attorney are active from the moment they are executed, *unless* a contingency is written into the instrument that postpones "activation" of the power until the occurrence of a certain event.

In the instant case, Ms. Walsonavich executed, on February 3, 1998, an unqualified power of attorney authorizing Mr. Bova to manage her financial affairs. In the absence of any contingency in the document, Pennsylvania law provides that the power of attorney was immediately effective. Whatever Mr. Bova's subjective feelings may have been as to his authority, under Pennsylvania law he was in fact authorized to manage Ms. Walsonavich's financial affairs by an unqualified power of attorney executed and made effective on February 3, 1998. Plaintiffs cannot meet the requirements of § 6511(h)(2)(B) because at all relevant times, Mr. Bova was actually authorized to manage her financial affairs. Therefore, Ms. Walsonavich's estate does not qualify for relief under § 6511(h), and is subject to the three-year statute of limitations in § 6511(d)(2). Plaintiffs are barred from recovery.

B. Plaintiffs' allegations support the conclusion that Mr. Bova was authorized to manage Ms. Walsonavich's financial affairs any time after the power of attorney was executed.

Plaintiffs claim that Mr. Bova was not authorized to manage Ms. Walsonavich's finances because the power of attorney she executed in 1998 was subject to an oral agreement that delayed the exercise of the powers conferred upon him until Ms.

Walsonavich was unable to "handle her affairs due to some disability." (Compl. ¶ 8; Pl. Resp. at 4). Plaintiffs also allege that Mr. Bova had the authority to determine when Ms. Walsonavich should be considered disabled.[4] (Compl. ¶ ¶ 8, 17; Pl. Resp. at 4). Thus, plaintiffs admit that at all times during Ms. Walsonavich's alleged disability, Mr. Bova was authorized to "activate" the power that authorized him to manage Ms. Walsonavich's financial affairs. Plaintiffs' allegation that Mr. Bova held an inactive power of attorney that he could activate at any time is not substantially different from the actual fact – *i.e.*, that Mr. Bova held an active power of attorney that he could exercise whenever he deemed appropriate after its execution.

Assuming, *arguendo,* that Mr. Bova did have an oral agreement with Ms. Walsonavich that would have made his power of attorney contingent upon her being disabled, plaintiffs' allegations regarding the nature of that agreement preclude them from satisfying the requirements of § 6511(h)(2)(B). If Mr. Bova was authorized to determine when he could activate the power of attorney over Ms. Walsonavich's finances, then he was authorized to manage her finances during the period of her alleged disability. There is no meaningful distinction between possessing discretion to activate and then exercise a power, and possessing discretion to exercise an already active power. Both premises achieve the same result: the holder of the power may choose to exercise

[4] Plaintiffs do not allege that a medical opinion was required to determine if or when Ms. Walsonavich had become disabled. Rather, plaintiffs allege that Mr. Bova and Ms. Walsonavich's attorney decided it "was the appropriate time for the power of attorney to be activated," "based on their observations" of Ms. Walsonavich. (Compl. ¶ 17). In their response, plaintiffs characterize the participation of Ms. Walsonavich's attorney in Mr. Bova's decision to exercise his power of attorney over her finances as a "consultation," not a concurring opinion needed to activate Mr. Bova's powers. (Pl. Resp. at 5). Thus, Mr. Bova allegedly possessed unilateral decision-making authority as to when he would "activate" his power. Mr. Bova does not allege that he sought or obtained a medical evaluation of Ms. Walsonavich's mental state, until he later sought a physician's statement to prove his claim that the decedent was "financially disabled". The physician's statement attached to the Complaint is dated March 19, 2007 – more than a year after Ms. Walsonavich died, and almost two years after Ms. Walsonavich's 1996 refund claim was filed.

the power at any time he deems appropriate. Plaintiffs cannot provide a personal statement to the contrary on behalf of Ms. Walsonavich's estate. Therefore, § 6511(h) does not allow plaintiffs to suspend the statute of limitations under § 6511(d)(2), and plaintiffs are barred from recovery.

On April 15, 2002 (with the filing of Ms. Walsonavich's return for 2001), the three-year period began to run within which she could file a refund claim for 1996. As the Complaint acknowledges (at ¶ 14), that three-year period would expire on April 15, 2005. According to the Complaint (at ¶ 15), Ms. Walsonavich began to be disabled "as early as April 2004." If that is true, then even by plaintiffs' lights, giving full credence to the alleged oral agreement (Compl., ¶ 8), Mr. Bova was authorized to "activate" the power of attorney as early as April 2004, when she became disabled. That is, there was never an instant in which Ms. Walsonavich was disabled and no one else was (in the words of § 6511(h)(2)(B) "authorized to act on behalf of such individual in financial matters." Rather, Mr. Bova was explicitly authorized to act for Ms. Walsonavich, but did not act because (plaintiffs allege) he did not realize that she had become disabled. But § 6511(h)(2)(B) inquires not as to whether there was someone who realized he was authorized to act, but as to whether there was someone authorized to act.

II. <u>There is no set of facts upon which plaintiffs can support their claim, and therefore the Complaint should be dismissed.</u>

The Pennsylvania statute governing powers of attorney requires the conclusion that Mr. Bova held a durable power of attorney that was effective on the date it was executed. Even if the Court were to conclude that an "oral agreement" did somehow postpone the effective date of Mr. Bova's powers, the fact that Mr. Bova was empowered to determine when that date would be meant that Mr. Bova held a power that was

equivalent to a durable power of attorney effective on the date it was executed. Moreover, if the effective date of Mr. Bova's power was somehow postponed, it could not have been postponed beyond early April 2004, the time at which Ms. Walsonavich became disabled. Thus, whether or not the Court accepts plaintiffs' assertion regarding an oral agreement, there exists no set of facts upon which plaintiffs can satisfy or avoid the requirements of § 6511(h)(2)(B). Consequently, § 6511(h) did not suspend the three-year statute of limitations imposed by § 6511(d)(2). Plaintiffs filed Ms. Walsonavich's claim for refund for the 1996 tax year on May 25, 2005 – 40 days after the applicable statute of limitations expired. Therefore, plaintiffs are precluded from recovery, and their Complaint should be dismissed.

WHEREFORE, defendant respectfully requests that this motion be granted, and that plaintiff's Complaint be dismissed without prejudice.

Respectfully submitted,

November 29, 2007

s/Jeffrey R. Malo
JEFFREY R. MALO
Attorney of Record
United States Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Voice: (202) 305-7539
Fax: (202) 514-9440
Email: jeffrey.r.malo@usdoj.gov

RICHARD T. MORRISON
Acting Assistant Attorney General

November 29, 2007

s/David Gustafson
DAVID GUSTAFSON
Chief, Court of Federal Claims Section

# APPENDIX 1

**Uniform Durable Power of Attorney Act of 1979 §§ 1 – 3 (with comments)**

**§ 1. [Definition].**

A durable power of attorney is a power of attorney by which a principal designates another his attorney in fact in writing and the writing contains the words "This power of attorney shall not be affected by subsequent disability or incapacity of the principal, or lapse of time," or "This power of attorney shall become effective upon the disability or incapacity of the principal," or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity, and, unless it states a time of termination, notwithstanding the lapse of time since the execution of the instrument.

COMMENT

This section, derived from the first sentence of UPC 5-501 (1969) (1975), is a definitional section that supports use of the term "durable power of attorney" in the sections that follow. The second quoted expression was designed to emphasize that a durable power with postponed effectiveness is permitted. Some UPC critics have been bothered by the reference here to a later condition of "disability or incapacity," a circumstance that may be difficult to ascertain if it can be established without a court order. The answer, of course, is that draftsmen of durable powers are not limited in their choice of words to describe the later time when the principal wishes the authority of the agent in fact to become operative. For example, a durable power might be framed to confer authority commencing when two or more named persons, possibly including the principal's lawyer, physician or spouse, concur that the principal has become incapable of managing his affairs in a sensible and efficient manner and deliver a signed statement to that effect to the attorney in fact. In this and following sections, it is assumed that the principal is competent when the power of attorney is signed. If this is not the case, nothing in this Act is intended to alter the result that would be reached under general principles of law.

ACTION IN ADOPTING JURISDICTIONS

Variations from Official Text:

PENNSYLVANIA

The substance of sections 1, 2, and 3 of the Uniform act is combined in one section of the Pennsylvania act [20 Pa.C.S.A § 5604].

**§ 2. [Durable Power of Attorney Not Affected By Lapse of Time, Disability or Incapacity].**

All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not disabled. Unless the instrument states a time of termination, the power is exercisable notwithstanding the lapse of time since the execution of the instrument.

COMMENT

This section is derived from the second sentence of UPC 5-501 (1969) (1975) modified by deleting reference to the effect on a durable power of the principal's death, a matter that is now covered in Section [4] [5-504] which provides a single standard for durable and non-durable powers. The words "any period of disability or incapacity of the principal" are intended to include periods during which the principal is legally incompetent, but are not intended to be limited to such periods. In the Uniform Probate Code, the word "disability" is defined, and the term "incapacitated person" is defined. In the context of this section, however, the important point is that the terms embrace "legal incompetence," as well as less grievous disadvantages.

**§ 3. [Relation of Attorney in Fact to Court-appointed Fiduciary].**

(a) If, following execution of a durable power of attorney, a court of the principal's domicile appoints a conservator, guardian of the estate, or other fiduciary charged with the management of all of the principal's property or all of his property except specified exclusions, the attorney in fact is accountable to the fiduciary as well as to the principal. The fiduciary has the same power to revoke or amend the power of attorney that the principal would have had if he were not disabled or incapacitated.

(b) A principal may nominate, by a durable power of attorney, the conservator, guardian of his estate, or guardian of his person for consideration by the court if protective proceedings for the principal's person or estate are thereafter commenced. The court shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification.

COMMENT

Subsection (a) closely resembles the last two sentences of UPC § 5-501 (1969) (1975); most of the changes are stylistic. One change going beyond style states that an agent in fact is accountable both to the principal and a conservator or guardian if a court has appointed a fiduciary; the earlier version described accountability only to the fiduciary. As explained in the introductory comment, the purpose of subsection (b) is to emphasize that agencies under durable powers and guardians or conservators may co-exist. It is not the purpose of the act to encourage resort to court for a fiduciary appointment that should

be largely unnecessary when an alternative regime has been provided via a durable power. Indeed, the best reason for permitting a principal to use a durable power to express his preference regarding any future court appointee charged with the care and protection of his person or estate may be to secure the authority of the attorney in fact against upset by arranging matters so that the likely appointee in any future protective proceedings will be the attorney in fact or another equally congenial to the principal and his plans. However, the evolution of a free-standing durable power act increases the prospects that UPC-type statutes covering protective proceedings will not apply when a protective proceeding is commenced for one who has created a durable power. This means that a court receiving a petition for a guardian or conservator may not be governed by standards like those in UPC § 5-304 (personal guardians) and § 5-401(2) and related sections which are designed to deter unnecessary protective proceedings. Finally, attorneys and others may find various good uses for a regime in which a conservator directs exercise of an agent's authority under a durable power. For example, the combination would confer jurisdiction on the court handling the protective proceeding to approve or ratify a desirable transaction that might not be possible without the protection of a court order. The alternative of a declaratory judgment proceeding might be difficult or impossible in some states.

It is to be noted that the "fiduciary" described in subsection (a), to whom an attorney in fact under a durable power is accountable and who may revoke or amend the durable power, does not include a guardian of the person only. In subsection (b), however, the authority of a principal to nominate extends to a guardian of the person as well as to conservators and guardians of estates. Discussion of this section in NCCUSL's Committee of the Whole involved the question of whether an agent's accountability, as described here, might be effectively countermanded by appropriate language in a power of attorney. The response was negative. The reference is to basic accountability like that owed by every fiduciary to his beneficiary and that distinguishes a fiduciary relationship from those involving gifts or general powers of appointment. The section is not intended to describe a particular form of accounting. Hence, the context differs from those involving statutory duties to account in court, or with specified frequency, where draftsmen of controlling instruments may be able to excuse statutory details relating to accountings without affecting the general principle of accountability.

**20 Pa.C.S.A. § 5604**

**Purdon's Pennsylvania Statutes and Consolidated Statutes**

**§ 5604. Durable powers of attorney**

(a) Definition.--A durable power of attorney is a power of attorney by which a principal designates another his agent in writing. The authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity. A principal may provide in the power of attorney that the power shall become effective at a specified future time or upon the occurrence of a specified contingency, including the disability or incapacity of the principal.

(b) Durable power of attorney not affected by disability or lapse of time.--All acts done by an agent pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not disabled. Unless the power of attorney states a time of termination, it is valid notwithstanding the lapse of time since its execution.

(c) Relation of agent to court-appointed guardian.--

(1) If, following execution of a durable power of attorney, the principal is adjudicated an incapacitated person and a guardian is appointed for his estate, the agent is accountable to the guardian as well as to the principal. The guardian shall have the same power to revoke or amend the power of attorney that the principal would have had if he were not an incapacitated person.

(2) A principal may nominate, by a durable power of attorney, the guardian of his estate or of his person for consideration by the court if incapacity proceedings for the principal's estate or person are thereafter commenced. The court shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification.

(d) Discovery of information and records regarding actions of agent.--

(1) If the agency acting pursuant to the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act, [FN1] is denied access to records necessary for the completion of a proper investigation of a report or a client assessment and service plan or the delivery of needed services in order to prevent further abuse, neglect, exploitation or abandonment of the older adult principal reported to be in need of protective services, the agency may petition the court of common pleas for an order requiring the appropriate access when either of the following conditions applies:

(i) the older adult principal has provided written consent for confidential records to be disclosed and the agent denies access; or

(ii) the agency can demonstrate that the older adult principal has denied or directed the agent to deny access to the records because of incompetence, coercion, extortion or justifiable fear of future abuse, neglect, exploitation or abandonment.

(2) This petition may be filed in the county wherein the agent resides or has his principal place of business or, if a nonresident, in the county wherein the older adult principal resides. The court, after reasonable notice to the agent and to the older adult principal, may conduct a hearing on the petition.

(3) Upon the failure of the agent to provide the requested information, the court may make and enforce such further orders.

(4) A determination to grant or deny an order, whether in whole or in part, shall not be considered a finding regarding the competence, capacity or impairment of the older adult principal, nor shall the granting or denial of an order preclude the availability of other remedies involving protection of the person or estate of the older adult principal or the rights and duties of the agent.

(e) Definitions.--As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Abandonment." As that term is defined in the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act.

"Abuse." As that term is defined in the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act.

"Agency." As that term is defined in the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act, except that in cities of the first class the term shall mean the Department of Aging.

"Exploitation." As that term is defined in the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act.

"Neglect." As that term is defined in the act of November 6, 1987 (P.L. 381, No. 79), known as the Older Adults Protective Services Act.

"Older adult principal." A principal who is 60 years of age or older.